NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**OPTICURRENT, LLC,**
*Plaintiff-Appellee*

**v.**

**POWER INTEGRATIONS, INC.,**
*Defendant-Appellant*

**MOUSER ELECTRONICS,**
*Defendant*

---

2021-1712

---

Appeal from the United States District Court for the Northern District of California in No. 3:17-cv-03597-EMC, Judge Edward M. Chen.

---

Decided:  February 23, 2022

---

DAVE R. GUNTER, Friedman, Suder & Cooke, Fort Worth, TX, argued for plaintiff-appellee.  Also represented by JONATHAN TAD SUDER; ROBERT GREENSPOON, Dunlap Bennett & Ludwig PLLC, Chicago, IL.

FRANK SCHERKENBACH, Fish & Richardson, PC, Boston, MA, argued for defendant-appellant.  Also represented

by MICHAEL R. HEADLEY, HOWARD G. POLLACK, Redwood City, CA; JOHN WINSTON THORNBURGH, San Diego, CA.

————————————

Before DYK, O'MALLEY, and HUGHES, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* HUGHES.

Opinion concurring-in-part and dissenting-in-part filed by *Circuit Judge* DYK.

HUGHES, *Circuit Judge.*

Opticurrent, LLC brought suit against Power Integrations, Inc., alleging infringement of claim 1 of U.S. Patent No. 6,958,623. Following a jury trial, the district court entered final judgment against Power Integrations. Power Integrations then challenged the patent's validity, seeking reexamination before the United States Patent and Trademark Office, and Opticurrent successfully overcame the challenge. Power Integrations contended that Opticurrent set forth arguments limiting the scope of its claimed matter such that, under the claim's narrower meaning disclosed during reexamination, Power Integrations's accused products no longer infringe the '623 patent. Premised on this contention, Power Integrations moved for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(2), (3), (5), and (6). But the district court disagreed with Power Integrations's characterization of Opticurrent's reexamination arguments and instead found the validity arguments Opticurrent made during reexamination consistent with its infringement arguments presented at trial. The district court denied the motion.

Taking issue with the district court's interpretation of Opticurrent's reexamination arguments, Power Integrations appeals the district court's Rule 60(b) denial. We affirm.

I

A

Opticurrent is the owner of the '623 patent, which teaches:

> [a] noninverting transistor switch having only three terminals, said terminals being a first terminal, a second terminal and a third terminal, said noninverting transistor switch comprising:
>
> > (a) a transistor connected to the second and third terminals, said transistor having an on switching state in which current is able [to] pass between the second and third terminals and an off switching state in which current is interrupted from passing between the second and third terminals,
> >
> > (b) a voltage stabilizer connected to the second and third terminals, and
> >
> > (c) a complementary metal oxide semiconductor (CMOS) inverter connected to the first terminal, the second terminal, said transistor and said voltage stabilizer, said CMOS inverter interrupting the passing of current between said voltage stabilizer and the second terminal when said transistor is in its off switching state.

'623 patent, 14:52–15:2.

The '623 switch claims an improvement over the three terminal noninverting transistor switch taught by U.S. Patent No. 5,134,323 (the '323 switch). *See* '623 patent, 2:13–20, 7:45–58. The '323 switch is one type of transistor switch "well-known [in the art] and widely used in commerce." *Id.* 4:13–18, 4:62–63. This switch is itself an improvement over a four terminal transistor, which is not "capable of deriving its operating power from its own

output terminal" like the '323 switch and must instead source its operating power from "an additional terminal connected to [a] power supply." Appx420–21; *see also* '323 patent, 2:16–29. Although the '323 switch is a notable improvement over a four terminal transistor, Opticurrent discovered that the '323 switch "experiences a considerable amount of [undesirable] current leakage" between its third (drain) terminal and its second (ground) terminal (collectively, the output terminals) when a high voltage is applied to the switch. '623 patent, 4:67–5:10, 5:29–36. To solve this problem, Opticurrent replaced the '323 switch's bipolar junction transistor with a CMOS inverter. Opticurrent implemented the CMOS inverter in an unconventional manner, attaching the PMOS transistor, or "the 'top' half of a CMOS inverter," Appx427, to the switch's depletion mode transistor as opposed to a "positive voltage supply." '623 patent, 6:1–17, 6:26–29, 14:64–15:2; *see also* Appx420–21. Opticurrent also shifted down the connection to the gate of the output transistor from the depletion mode transistor to the PMOS transistor. '623 patent, 5:59–61, 6:1–17, 6:26–29, 6:46–50.

These novel circuit alterations turned the depletion mode transistor into "a low input current voltage stabilizer" that "is dedicated primarily to supply[ing] the voltage . . . passed from" the third terminal to the CMOS inverter. *Id.* 6:37–42. And this resulted in "a significantly lower amount of current leakage between" the two output terminals. *Id.* 7:38–58.

B

On April 1, 2016, Opticurrent filed suit against Power Integrations, alleging infringement of claim 1 of the '623 patent. The parties primarily disputed whether the accused products qualify as three terminal switches, with the trial "focused in large part on whether [Power Integrations's] accused product[s] [were] in fact connected to a 'power supply.'" Appx2; *see also* Appellant's Br. 26

(admitting the same). Power Integrations asserted that there was no infringement because "its accused products cannot be used unless the fourth pin is attached to an external capacitor that is necessary to supply power to the chip." Appx92. In other words, Power Integrations claimed that the external bypass capacitor attached to the switch's internal supply voltage node is a power supply connected to a fourth terminal, with the power supply being necessary for the operation of the accused products.

Opticurrent countered that the capacitor neither connects to a fourth terminal nor supplies power to the circuit. Rather, it asserted that the capacitor simply helps regulate the stabilized voltage. Opticurrent's technical expert, Dr. Regan Zane, testified that the bypass capacitor is "connected at the output of the voltage stabilizer, and only to the voltage stabilizer," "[w]hich is an internal node." Appx1052–53. Having only a connection "to the output of the voltage stabilizer," Dr. Zane opined that the capacitor simply "help[s] stabilize that voltage, the output of the regulation." Appx1053. And utilizing Power Integrations's schematics and data sheets with illustrations of the accused products, Dr. Zane conveyed how the accused products derive their power from the third terminal (drain pin) through the voltage stabilizer and supply this power (voltage) to the CMOS inverter. *See* Appx780–81, 1046–64.

After a four-day trial, the jury rendered its verdict finding that the accused products infringed, both literally and under the doctrine of equivalents, apparently agreeing with Opticurrent's infringement arguments. The district court entered final judgment consistent with the jury's verdict, ordering Power Integrations to pay $1.2 million in damages for direct infringement occurring through March 31, 2018 and "an ongoing royalty of 3.5% of revenues for ongoing sales made by [Power Integrations] directly into the United States of the infringing products." Appx11–12.

C

Two months after trial, Power Integrations requested ex parte reexamination of the '623 patent, contending that claim 1 was rendered obvious by the '323 patent in combination with U.S. Patent No. 5,304,867 (Morris) or U.S. Patent No. 4,471,242 (Noufer). Its request was granted and led the PTO to issue an office action on November 1, 2019, finding the challenged claim obvious in view of the same. The Examiner determined that the '323 switch includes a voltage stabilizer since (1) the '323 switch contains a depletion mode transistor; (2) its depletion mode transistor is interchangeable with the depletion mode transistor in the '623 switch; (3) the depletion mode transistor in the '623 switch acts as a voltage stabilizer; and thus (4) the depletion mode transistor in the '323 switch must also be able to perform as a voltage stabilizer. Appx326–27. The Examiner accordingly found that the '323 patent discloses every limitation of the '623 patent's challenged claim, except the CMOS inverter. But the Examiner concluded that it would have been obvious to one of ordinary skill in the art to substitute the single transistor used in the '323 switch with a CMOS inverter because the inverters are functionally equivalent and it would have been obvious to a POSA to substitute "one well known inverter for another." Appx327.

In response, Opticurrent challenged the Examiner's determination that the '323 patent discloses a voltage stabilizer. Opticurrent explained that the Examiner's determination was erroneously premised on "the similarity of a *component*"—the depletion mode transistor—"without regard to how that component changes behavior" when connected to switches having different circuit configurations. Appx383. Opticurrent also challenged the Examiner's obviousness determination. It asserted that a POSA would not have been motivated to combine a CMOS inverter with the '323 switch because the voltage derived at the source node of the '323 switch's depletion mode transistor "toggles between 0.2 V and 0.7 V," which "is nowhere near within

the acceptable range or behavior of a power supply voltage $V_{DD}$ for traditional use of a CMOS inverter at that node." Appx425–26 (explaining that "the CMOS inverter will not operate properly with a power supply voltage $V_{DD}$ below +3.0 V"); *see also* Appx391 ("[T]he existing configuration of [the '323 switch] had nowhere to place a CMOS inverter, based on perceptions of persons of skill in the art.").

Opticurrent explained that "[i]t was the inventor's contribution (with the '623 [p]atent) to recognize that changing several things about the ['323 switch]"—i.e., (1) adding PMOS transistor 121, which formed new node 141 "that is essential in forming the voltage stabilizer and eliminating current leakage"; and (2) "moving down the junction that drives the power transistor so that it is no longer coming from the source of a depletion mode [transistor]"—"could allow inclusion of [a] CMOS" inverter. Appx392. And by virtue of these circuit alterations, the depletion mode transistor changes its function radically from acting as a current source to operating as a voltage stabilizer. Appx384, 437; *see also* Appx392 ("Whereas the depletion mode element of the '323 [p]atent acts as a current source, the depletion mode element of the '623 [p]atent acts as a voltage stabilizer. This happened because using a CMOS as configured and claimed, instead of a bipolar junction transistor, changed the behavior of the previous circuit components."). Thus, it is the "combined impact on the operation of the circuit"—following from the CMOS inverter's creation of and connection to a voltage stabilizer—that "represents a significant innovative step over prior three terminal designs." Appx428. According to Opticurrent, this innovative step is conveyed through claim 1's limitations, which "recite[] that the CMOS [inverter] is connected to four things" including the voltage stabilizer, but "none of which is the power rail (the conventional way)." Appx390.

The Examiner found Opticurrent's arguments persuasive and issued its decision confirming the patentability of the challenged claim on February 12, 2020.

D

On June 25, 2020, Power Integrations moved to set aside the district court's final judgment pursuant to Rule 60(b). Power Integrations asserted that Opticurrent failed to disclose its understanding of its claim scope, i.e., the meaning of "unconventional" use of CMOS, during litigation "and in fact relied upon *the opposite* to obtain an infringement verdict." Appx144, 148. Power Integrations claimed that "the CMOS inverter is 'conventionally' attached to the power rail $V_{DD}$" in the accused products, "just like the prior art that Opticurrent distinguished during reexam." Appx144. This, according to Power Integrations, represents newly discovered evidence and entitles it to relief under Rule 60(b)(2). Power Integrations characterized Opticurrent's disclosure as "nothing short of fraudulent," and claimed that its requested relief could therefore also be granted under Rule 60(b)(3). Appx155. Power Integrations further asserted that it was entitled to relief under Rule 60(b)(5) because "requiring the ongoing payment of royalties is no longer equitable given how Opticurrent has undermined the very basis for the infringement verdict that it obtained." Appx155. Lastly, Power Integrations claimed "extraordinary circumstances" exist that warrant Power Integrations's relief from judgment under Rule 60(b)(6). Appx156.

The district court disagreed with Power Integrations, finding that Opticurrent's representations at trial and during reexamination were consistent. The court pointed out that Opticurrent's representations "must be read in context." Appx5. Doing so, the court determined that "Opticurrent ha[d] consistently argued that the '623 patent was inventive because it was a three-terminal switch that did not require the CMOS inverter to be powered by a direct connection to a positive supply voltage such as that provided by an external power supply." Appx5–6.

The district court described the "core of Opticurrent's argument" during reexamination to be "that the design of the '623 [switch] changed the function and operation of the '323 [switch]"—first, by converting the depletion mode transistor from a current source to a voltage stabilizer and, second, by explaining that a POSA would not have been motivated to combine a CMOS inverter and the '323 switch since the switch's power supply voltage is insufficient to power a CMOS inverter. Appx7–8. That is, "[t]he absence of a connection to a positive voltage supply ha[d] been central to Opticurrent's position both at trial and before the PTO." Appx6. Because the district court found Opticurrent's statements consistent at trial and during reexamination, it denied Power Integrations's Rule 60(b) motion.

Power Integrations timely appealed. We have jurisdiction under 28 U.S.C. § 1292(a)(1) and (c)(1).

## II

Power Integrations appeals the district court's decision denying its Rule 60(b) motion. We generally "defer to the law of the regional circuit" in which the district court sits, here the Ninth Circuit, because that rule is procedural in nature and "unrelated to patent law issues." *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1381 (Fed. Cir. 2002). The Ninth Circuit reviews a district court's Rule 60(b) ruling for abuse of discretion, *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004), which occurs when its decision rests on an error of law or its "application of the law to the facts was 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record,'" *Cardpool, Inc. v. Plastic Jungle, Inc.*, 817 F.3d 1316, 1321 (Fed. Cir. 2016) (citation omitted).

Power Integrations challenges the district court's Rule 60(b) denial, contending that the court's "dispositive error" was its interpretation of Opticurrent's arguments made to overcome a rejection during reexamination. Appellant's Br. 23, 26. According to Power Integrations,

"Opticurrent obtained its infringement verdict by offering evidence that [Power Integrations's] accused CMOS inverter is connected to a Vdd power rail," but it then preserved the validity of the asserted claim on reexamination by disclaiming the very same connection. *Id.* at 23. Thus, in Power Integrations's view, Opticurrent advocated a narrow claim scope during reexamination that is directly at odds with what it represented to the jury and district court at trial in order to secure judgment in its favor. As a result, Power Integrations asserts, these inconsistent arguments entitle it to relief under Rule 60(b). Power Integrations also asserts that Opticurrent's "clear disclaimer necessitates new claim construction," thereby providing a second basis that "separately[] justifies relief" under Rule 60(b). Appellant's Reply Br. 2. Power Integrations accordingly claims entitlement to Rule 60(b) relief "on multiple grounds—newly discovered evidence, misrepresentation or misconduct, changed circumstances affecting prospective relief, and extraordinary circumstances." Appellant's Br. 23.

A

The doctrine of prosecution disclaimer precludes a patentee "from recapturing through claim interpretation specific meanings disclaimed during prosecution," *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003), including "statements made in reexamination proceedings," *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017). To invoke the doctrine, the patentee's disavowal of claim scope must "be both clear and unmistakable." *Omega Eng'g*, 334 F.3d at 1326. "An ambiguous disclaimer" will not "limit a claim term's ordinary meaning." *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005). That is, if a reexamination "argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term," then there is no "clear and unmistakable" disclaimer. *Id.* Thus, only "[w]hen the patentee makes clear and unmistakable prosecution arguments limiting

the meaning of a claim term in order to overcome a rejection" will "the courts limit the relevant claim term to exclude the disclaimed matter." *01 Communique Lab'y, Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (citation omitted).

Here, Power Integrations asserts that "Opticurrent told the Examiner that the claimed invention requires 'unconventional use' of its 'CMOS inverter,' such that the CMOS inverter is not connected to 'the power rail.'" Appellant's Br. 6 (quoting Appx390–91). Power Integrations contends that this representation served as a disclaimer to overcome the Examiner's rejection. Power Integrations further argues that "what Opticurrent disclaimed . . . was *not* a fourth terminal connected externally to a power supply, but a CMOS inverter connected to a Vdd power rail," where a "Vdd power rail" is "an internal circuit structure that provides a known, reference voltage level for use by all the internal elements of the chip, including the CMOS [inverter]." *Id.* at 22, 28. Said differently, Power Integrations claims that Opticurrent disclaimed a CMOS inverter connected to an internal component that provides a constant voltage throughout the circuit. Power Integrations's articulation of this "conventional" use of a CMOS inverter, however, strips Opticurrent's statements from their context, providing an incomplete and ultimately inaccurate characterization of this disclaimed, "conventional" way.

Power Integrations hangs its hat on Opticurrent's assertion that "[n]o power rail connection exists." *Id.* at 38 (quoting Appx391). Ignoring the surrounding arguments Opticurrent made on reexamination, Power Integrations would have us define "Vdd" as "an internal circuit structure that provides a known, reference voltage level for use by all the internal elements of the chip, including the CMOS [inverter]." *Id.* at 22. But adopting Power Integrations's proposed definition would undermine the significance that Opticurrent attributed to the voltage stabilizer as the particular internal circuit structure that maintains a high

12          OPTICURRENT, LLC v. POWER INTEGRATIONS, INC.

enough voltage to power a CMOS inverter, even in a three terminal switch. Appx383–86, 391–92; *see* '623 patent, 6:38–42. We accordingly reject Power Integrations's contention that the "conventional" CMOS connection disclaimed by Opticurrent is "a CMOS inverter internally connected to a Vdd power rail." Appellant's Br. 23.

Rather, context makes clear that this disclaimed, "conventional" way refers to a CMOS inverter that is connected to an external power supply via a fourth terminal. The unconventional use of a CMOS inverter disclosed in the '623 patent is the novel configuration in which a three terminal switch can now derive enough voltage from its own output terminal to provide the necessary operating power for the switch to use a CMOS inverter, instead of a bipolar junction transistor. Appx391–92; *see also* Appx411 ("That nontraditional and unconventional use has the CMOS inverter connected in a specific way in a three terminal switch as required by Claim 1, but not connected to a power supply ($V_{DD}$) via a fourth terminal (referred to in the [specification] as 'positive supply voltage (+V)')." (referring to '623 patent, 6:1–17)); Appx414 ("The CMOS inverter does not require a fourth terminal connected to $V_{DD}$, as was the traditional use of a CMOS inverter.")

Power Integrations contends that Opticurrent's disclaimer "does not relate to whether the chip has a fourth terminal connected to a power supply." Appellant's Br. 29. But we cannot divorce the three-versus-four terminal argument from Opticurrent's statements about the source of the CMOS inverter's operating power. Power Integrations's strained interpretation of Opticurrent's reexamination arguments ignores Opticurrent's unequivocal description of the circuit's novel configuration that allows for successful operation of a CMOS inverter connected to a three terminal switch. Appx384–86, 391–93. Under a proper construction, we conclude that Opticurrent disclaimed a CMOS inverter connected to an external power supply.

B

Power Integrations also argues that "Opticurrent obtained its infringement verdict by offering evidence that [Power Integrations's] accused CMOS inverter is connected to a Vdd power rail," Appellant's Br. 23, while preserving the validity of the asserted claim on reexamination by disclaiming the very same connection. Pointing to the "vdd!" label Power Integrations uses to designate the internal supply voltage node in its own schematics, it contends that this "vdd!" node is equivalent to the "Vdd power rail" discussed during reexamination. Once again, however, Power Integrations improperly strips Opticurrent's statements from their context and overlooks the fact that Power Integrations's "vdd!" label refers to the same node that Opticurrent describes as a voltage stabilizer. The trial record makes clear that "vdd!" refers to "the internally-generated power supply derived from the third drain terminal." Appx781.

Moreover, Power Integrations's own data sheets establish that the accused products obtain power from the voltage stabilizer, which "charges the bypass capacitor . . . by drawing a current from the voltage on the DRAIN [or third terminal], whenever the [depletion mode transistor] is off." Appx1006.[1] The data sheets identify the bypass pin as "the internal supply voltage node," with the bypass capacitor acting as storage for the energy that powers the device when MOSFET is on. Appx1006. And Power Integrations further touts that the accused product can "operate continuously from the current drawn from the [drain] pin."

---

[1]    *See also* Appx1005 (explaining that the drain "pin is the power MOSFET drain connection," which "provides internal operating current for both start-up and steady-state operation"; explaining that the bypass pin "is the connection point for an external bypass capacitor for the internally generated 6 V supply").

Appx1006. This is consistent with Opticurrent's reexamination arguments since both describe a CMOS inverter connected to an internal node that supplies voltage sufficient to power the switch (through the inverter), the voltage being derived from the third terminal (or drain pin) and passed through the voltage stabilizer.

C

Power Integrations asserts that "the sole basis of the district court's denial was its erroneous interpretation of the reexamination record, leading to the incorrect finding that there was no inconsistency." Appellant's Br. 31. According to Power Integrations, "[o]nce this error is resolved," it becomes evident that Opticurrent's arguments at trial and during reexamination are contradictory and that Opticurrent "conceal[ed] its view of the true claim scope from both the jury and [Power Integrations]." *Id.* at 23. Power Integrations contends that relief under Rule 60(b) is therefore "warranted on multiple grounds— newly discovered evidence, misrepresentation or misconduct, changed circumstances affecting prospective relief, and extraordinary circumstances." *Id.*

Under Rule 60(b), the court has discretion to "relieve a party . . . from a final judgment, order, or proceeding for the following reasons":

> . . .
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously call intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> . . .
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that

has been reversed or vacated; or applying it pro-spectively is no longer equitable; or

(6) any other reason that justifies relief."

Fed. R. Civ. P. 60(b). Because we interpret Opticurrent's reexamination arguments substantially the same way that the district court did, we conclude that the district court did not abuse its discretion in denying Power Integrations's request for Rule 60(b) relief.

First, because Opticurrent's disclaimer is already es-tablished by the claim language as it was construed at trial, the disclaimer does not constitute "new evidence." *See* Appx981–86 (construing "a noninverting transistor switch having only three terminals" to mean "a noninverting tran-sistor switch with three terminals that does not have a fourth terminal," i.e., "an external connection point," that is "connected to a power supply"). Therefore, Power Inte-grations cannot demonstrate entitlement to relief under Rule 60(b)(2).

Second, because Opticurrent's reexamination argu-ments are consistent with the record evidence and infringe-ment arguments it presented at trial, Power Integrations cannot meet its burden under Rule 60(b)(3). *See Casey*, 362 F.3d at 1260 ("To prevail, the moving party must prove by clear and convincing evidence that the verdict was ob-tained through fraud, misrepresentation, or other miscon-duct and the conduct complained of prevented the losing party from fully and fairly presenting the defense." (cita-tion omitted)).

Third, we find no abuse of discretion in the district court's denial under Rule 60(b)(5). The Ninth Circuit re-quires the moving party, when seeking relief under Rule 60(b)(5), to show "that there has been a significant change in factual conditions such that it is no longer equi-table that the judgment have prospective application." *F.T.C. v. Enforma Nat. Prods., Inc.*, 31 F. App'x 349, 349–

50 (9th Cir. 2002) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383–84 (1992)). Here, we see none. At most, Opticurrent expressly disclaimed during reexamination what it implicitly disclaimed in the specification of the '623 patent. That change alone, however, is not significant and has no impact on the infringing nature of Power Integrations's accused products. Because Power Integrations has not shown "that there has been a significant change in factual conditions such that it is no longer equitable that the judgment have prospective application," it cannot meet its burden of establishing that changed circumstances warrant relief. *Id.*

Finally, while "Rule 60(b)(6) does allow the district court to vacate its judgment based on 'any other reason justifying relief from the operation of the judgment,'" *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1088 (9th Cir. 2001), Power Integrations only claims entitlement to relief under clause (6) because "[t]elling the Patent Office that the asserted claim excludes exactly what Opticurrent accused of infringement is outrageous," Appellant's Br. 36 (emphasis omitted). "The fatal flaw in [Power Integrations's] argument centers on the phrase 'any other reason.' The reason [Power Integrations] state[s] is not another reason at all," but is instead already contained in Rule 60(b)(2) or Rule 60(b)(3). *Lyon*, 252 F.3d at 1088. "The long-standing rule . . . is that 'clause (6) and the preceding clauses are mutually exclusive; a motion brought under clause (6) must be for some reason other than the five reasons preceding it under the rule.'" *Id.* at 1088–89 (citation omitted). And describing Opticurrent's "fraudulent infringement theory" as "outrageous" does not suffice. The district court did not abuse its discretion.

## III

Power Integrations has not established a cognizable basis to justify relief from judgment. We accordingly

OPTICURRENT, LLC v. POWER INTEGRATIONS, INC.          17

conclude that the district court did not abuse its discretion in denying the Rule 60(b) motion.

## AFFIRMED

COSTS

No costs.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**OPTICURRENT, LLC,**
*Plaintiff-Appellee*

**v.**

**POWER INTEGRATIONS, INC.,**
*Defendant-Appellant*

**MOUSER ELECTRONICS,**
*Defendant*

———————————

2021-1712

———————————

Appeal from the United States District Court for the Northern District of California in No. 3:17-cv-03597-EMC, Judge Edward M. Chen.

———————————

DYK, *Circuit Judge*, concurring-in-part and dissenting-in-part.

While I agree that there is no basis for reopening the judgment as to past infringement through the mechanism of a Rule 60(b) motion, I respectfully disagree with the majority's holding as to prosecution disclaimer and ongoing royalties. In my view, Opticurrent made a "clear and unmistakable" disclaimer of patent scope. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1326 (Fed. Cir. 2003). The

2          OPTICURRENT, LLC v. POWER INTEGRATIONS, INC.

ongoing royalties award to Opticurrent cannot be sustained since it is based on disclaimed claim scope.

I

Here, after the district court found infringement of claim 1, which requires "a complementary metal oxide semiconductor (CMOS) inverter connected to the first terminal, the second terminal, said transistor and said voltage stabilizer," Power Integrations ("PI") requested *ex parte* reexamination with the PTO. The PTO granted PI's request and adopted two grounds in initially rejecting claim 1 of the '623 patent: U.S. Pat. 5,134,323 to Congdon ("the '323 patent") in view of U.S. Pat. 5,304,867 to Morris ("Morris") and the '323 patent in view of U.S. Pat. 4,471,242 to Noufer ("Noufer"). Both the '323 patent and the '623 patent cover three-terminal switches without a fourth terminal coupled to an external power supply.

During reexamination and seeking to overcome the rejection, Opticurrent disclaimed the connection from a CMOS inverter either to any power rail (a broad disclaimer) or only to a power rail "connected to an external power supply via a fourth terminal" (a narrow disclaimer). Maj. Op. 12. I think the reexamination prosecution history shows that the former is correct. The specification of the '623 patent is clear that the invention does not include a connection to a power rail.

To overcome the rejections in reexamination, Opticurrent argued,

> This unconventional use of CMOS exists as claim limitations. <u>Claim 1 recites that the CMOS is connected to four things, none of which is the power rail (the conventional way). . . . No power rail connection exists.</u> Hence, the claims positively recite this unconventional use of CMOS technology.

> Undisputed evidence shows that the claimed connection was indeed an unconventional CMOS

connection. Dr. Zane confirms this is so.  The [cited prior art] corroborates the inventor's description of the traditional and conventional way of connecting a CMOS, since it shows connection of the source terminal to the power rail, $V_{DD}$.  Dr. Zane provides numerous additional contemporaneous examples corroborating the traditional connection, which again, is to the power rail $V_{DD}$ or its equivalent. Even the cited Noufer and Morris references merely show a variant on this traditional and conventional way—a connection derived from $V_{DD}$. Nothing in the record shows that a person of ordinary skill was even aware that a CMOS inverter (a digital circuit) could be connected in the manner eventually claimed in claim 1[, i.e., with connections that did not involve a power rail].

Beyond the '623 Patent's inventive contribution of connecting a CMOS inverter in an unconventional and nontraditional way, the existing configuration of Congdon '323 had nowhere to place a CMOS inverter, based on perceptions of persons of skill in the art.

J.A. 390–91 (citations omitted) (emphases added).

The majority concludes the disclaimer only excludes a CMOS inverter "connected to an external power supply via a fourth terminal."  Maj. Op. 12.  But on its face, Opticurrent's argument disclaimed a CMOS inverter connected to any power rail.  To be sure, the prior art in question discloses an "external power supply" connected to a fourth terminal.  But the language in the disclaimer is broader, and we have held that the "fact that the [patent] applicant may have given up more than was necessary does not render the disclaimer ambiguous" because the focus is "on what the applicant said, not on whether the representation was necessary[.]"  *Uship Intell. Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013).  Thus, I conclude that

4        OPTICURRENT, LLC v. POWER INTEGRATIONS, INC.

Opticurrent disclaimed any power rail connection, and thereby materially altered the scope of the claim.

II

Despite my view as to the scope of the disclaimer, I would not disturb the final judgment of damages for past infringement. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340 (Fed. Cir. 2013) ("[C]ancellation of a patent's claims cannot be used to reopen a final damages judgment."); *see also WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1071 (Fed. Cir. 2019) ("*Fresenius* only applies where a judgment is not final. . . . [I]t does not allow reopening of a satisfied and unappealable final judgment." (citations omitted)); *Moffitt v. Garr*, 66 U.S. 273, 283 (1861) (noting money damages cannot be recovered back when a patent is surrendered because title to the damages depends on the judgment of the court rather than the patent).

I reach a different conclusion as to ongoing royalties. As to ongoing royalties, there are several established principles that govern here:

First, ongoing royalty orders are, for all practical purposes, similar to injunctions—both are prospective, equitable remedies. *See* 35 U.S.C. § 283; *Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1315 (Fed. Cir. 2012); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313–14 nn.13–14 (Fed. Cir. 2007).

Second, an injunction, and hence an ongoing royalty order, cannot continue if the "legal basis" for the injunction ceases to exist. *ePlus, Inc. v. Lawson Software, Inc.*, 789 F.3d 1349, 1355–56 (Fed. Cir. 2015); *see also Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 422 (1855) (holding that an injunction should be dissolved when the

right forming the basis of the injunction was later modified).

Third, in the case of a reexamination, an existing claim ceases to exist if the claim is canceled or materially amended. *Fresenius*, 721 F.3d at 1340 ("[I]f the original claim is cancelled or amended to cure invalidity, the patentee's cause of action is extinguished and the suit fails."); *ePlus*, 789 F.3d at 1356 ("[P]reviously conferred" rights in a patent claim "have ceased to exist" when the claim is canceled through reexamination).

Fourth, a disclaimer has the same effect as an amendment. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) ("Arguments made during the prosecution of a patent application are given the same weight as claim amendments.").

Under these circumstances, the disclaimer here is material and has the effect of eliminating the claim. The elimination of the claim requires vacating the ongoing royalty order.